## THE WYOMISSING.

(District Court, E. D. New York. July 31, 1906.)

COLLISION—TOW AND ANCHORED DREDGE.

A dredge, engaged in government work in dredging a new channel in the Arthur Kill, at the close of work in the afternoon was breasted off toward the Staten Island shore. During the night a collision occurred between the dredge and one of the starboard scows in a tow of 22 arranged in tiers of 4 boats each, except the last tier. A preponderance of the evidence showed that the dredge was 100 feet or more south of the south line of the new channel and as near the shore as she could safely get, and that the tow had an available space of 500 feet in which pass. *Held,*

that the collision must be attributed solely to the fault of the tug in failing to keep the tow at a safe distance.

In Admiralty.    Suit for collision.

Carpenter, Park & Symmers, for libelant.

Armstrong & Brown, for claimant.

THOMAS, District Judge.    On October 25th the libelant's dredge No. 2, pursuant to a contract with the United States, was dredging a new channel, 300 feet wide, in the Arthur Kill.    Work was stopped about half past 5 o'clock p. m., and the dredge was breasted off by the steam tug Newton towards the Staten Island shore.    Between 4 and 5 o'clock in the morning of October 26th, the steam tug Wyomissing, aided by the tug Transit on her starboard side, was towing, on a hawser which was 50 fathoms in length, 22 loaded canal boats and barges, arranged 4 in a tier, save the last tier, where there were 2.    The forward tier contained 4 scows, each about 30 feet wide.    On the starboard side of the tow was Pencoyd, a helping tug.    The starboard boat in the second tier came in collision with the starboard corner of the dredge, which was headed westerly.    The claimant's evidence tends to show that the dredge was in the middle of the channel, although some of its witnesses state that it was somewhat nearer the southerly side thereof; that a schooner, 30 feet in width, was lying at the docks on the north side of the Kill, on which the flood tide set, so that there was not sufficient room to pass the dredge; and that, as the point itself is on that tide one of the most difficult for navigation, the tugs were not in fault for the collision.

There are two essential questions of fact:    How much room did the tow have?    Could the dredge have given her more room?    The parties differ as to what point opposite the Staten Island shore the dredge was at the time of the collision and as to her relation to the center of the new channel.

The claimant's evidence tends to show that the dredge was in the new channel, and opposite Dooley's Point, at the point marked "X," through which Capt. Scheid of the Wyomissing and others afterwards made soundings every 15 feet, whereby he discovered, as he testified, that the water showed a depth of "21 feet up to about 150 feet from the Staten Island shore; * * * from 16 to 14 feet to within about 75 of the shore."    Thereupon, as he testified, the water gradually shoaled up until he found 12 feet of water within 25 feet of the shore.

The evidence for the libelant, given by Vollum, the government inspector on dredge No. 2, shows that the dredge had been working on the fourth cut on the south side of the central line of the new channel, that each cut was 25 feet wide, and that she was breasted off to the point marked "X" (opposite which he placed his initials, "P. E. V."). Vollum knew approximately where the dredge was before and after she was breasted off, as he had the official map showing the workings. He was an intelligent and apparently a fair witness.    He places the dredge at the time of the collision farther to the eastward than the place indicated by the claimant's witnesses, and within 150 feet of the Staten Island shore.    He states that she was 100 or 125 feet south of the south line of the new channel, and that she was carried so far

to the southward that her port side same against a bank, so that she listed. Johnsen, the captain of the dredge, estimates that she was breasted off 50 feet south of the new channel and until she was 150 feet from the Staten Island shore, and he also describes her list from striking the bank, although he seemed to think that the listing was caused by the spuds striking the bank. The spuds were four great timbers, one in each corner of the dredge. The forward spuds weighed about 20 tons each, and the after spuds about 8 to 10 tons each. These spuds were used to hold the dredge in position. They could have been drawn up by some labor, and the draft thereby reduced to 7½ feet; but in that case other means of anchoring would have been required, and, moreover, this would have allowed the bottom of the dredge to ground, if, perchance, sufficient shallow water was met, which would have exposed the machinery of the dredge to injury. It is thought that the libelant was not required to draw up the spuds.

This evidence that the dredge was breasted off is supported by Taylor, the owner of the dredge, who places the distance from the Staten Island shore at 125 feet; by Moriarity, the captain of the attending tug General Newton, who states that he by means of his tug breasted the dredge to a point about 125 feet distant from the Staten Island shore, when the scow on the port side of the dredge grounded, with 8 to 12 feet of water on her port side; by Ittman, the United States inspector of dredge No. 7, which was lying about 800 feet to the eastward of dredge No. 2, who states that the port side of the scow was about 125 feet from the Staten Island shore and the starboard side of the dredge 200 feet therefrom. These witnesses saw the location by daylight, while the claimant's witnesses saw the dredge only by night. The claimant's witnesses—Scheid, master, Martin and Milles, deck hands on the Wyomissing; Halpin, the pilot, and Scott, master, of the Transit; O'Toole, master of the Pencoyd; Carolan, pilot of the tug Overbrook, who followed Scheid's tow and safely passed the dredge with a tow of 18 or 20 boats—placed the dredge in the middle of the channel, or a little to the southward thereof. Savage, the captain of the Erie, stated that at low tide there was sufficient water to within 90 or 100 feet of the point "X" on the line marked "X, X." But that line was somewhat westward of the actual location of the dredge when the collision occurred. O'Toole placed the dredge off Dooley's Point, and testified:

"Q. What is your course, when you come up to Dooley's Point from the bridge, with respect to one shore or the other? A. About northeast. Q. How close do you go to the shore? A. To the Staten Island shore you can go right along there within 25 feet of it. Q. Did you go there on this occasion? A. We couldn't do it. Q. Why not? A. On account of the dredge being there in midstream. Q. If it hadn't been there, you could have done it, could you? A. If it hadn't been there, we could have done it very easy. * * * Q. You say, after you get up to Dooley's Point, you can go within 25 feet of the Staten Island shore from Dooley's Point? A. You can go within 25 feet, but naturally we go along there 100 feet all the way from the time we leave the bridge until we come to the Point."

Later he says:

"I know we can go within 10 feet of the shore west of Dooley's Point. Q. How about east of Dooley's Point? A. You come around Dooley's Point, and it

shoals up. The tide cuts off there, and it shoals up on your starboard hand. * * * Q. After you pass Dooley's Point to the eastward, what do you say? A. It shoals all up; all flat. Q. You mean you can't go within 100 feet of the Staten Island shore? A. Not with 10 feet of water, you couldn't. Q. That is to the eastward of Dooley's Point? A. That is to the eastward of Dooley's Point."

He further states that the dredge was opposite the point marked "X," on the line marked "X, X":

"Q. That you call Dooley's Point, and opposite that point, in the center of the stream, you would say the dredge was? A. Yes, sir."

This evidence has been given in some detail, as it furnishes a probable explanation of the differing statements of the witnesses as to the navigable water on the south side of the channel. The measurements of Capt. Scheid have already been noted. They differ materially from the evidence of Capt. Moriarity, who made measurements before the trial was concluded, whereby he found, as he states, that five soundings, beginning at the east end of Dooley's dyke, show, 130 feet off, 8 feet of water. He said:

"We went down abreast of Dooley's property, where the dry dock is, that we fetched about here (drawing a line on the chart). We went off there 130 feet, and found 9 feet of water. Q. 130 feet north from there? A. North from there. We went down farther, taking five soundings below this. We ran off 130 feet, and found 10 feet of water. We ran down farther 100 feet, and found 10 feet. And at the point we stopped the boat, right up on the point, and found, 24 feet off, 8 feet of water, and the boat was right against the point then in 8 feet of water."

This evidence, in connection with that of O'Toole, claimant's witness, shows that the dredge was anchored as far towards Staten Island as was safe, and that the libelant's evidence that she or her scow struck a bank and was precluded from going further south is the probable fact. The claimant urges that the dredge should have been taken to the docks on the north shore. But this seems unnecessary, even if it was practicable. The tow had room to pass to the northward of the dredge. The Overbrook and her tow followed the Wyomissing at a short interval of time, and passed between the dredge and docks on the New Jersey shore. The libelant's witnesses place the available breadth of water at not more than 250 feet. But the new channel is 300 feet wide, and the whole width available for passage was probably about 500 feet.

It is concluded that the tug was negligent in not keeping her tow off the dredge, with such water at her disposal. The libelant will have a decree.